IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JESSE SOTO,

        Plaintiff,

        v.

PATRICK R. DONAHOE, Postmaster
General,

        Defendant.
_____

Case No. 6:12-cv-1400-MC

OPINION AND ORDER

MCSHANE, Judge:

      Plaintiff Jesse Soto ("Soto") alleges he was the subject of discrimination, retaliation and a hostile work environment during his employment with the United States Postal Service. Defendant Postmaster Patrick Donahoe for the United States Postal Service moves for summary judgment. Because there are genuine issues of material fact regarding the discrimination and retaliation claims, but not the hostile work environment claim, defendant's motion (ECF No. 15) is DENIED in part and GRANTED in part.

## BACKGROUND

      Soto, a Hispanic male, was employed by the United States Postal Service for fourteen years. (Soto Decl. ¶¶ 2-3.) From February 2005 to April 20, 2012, Soto was a Supervisor of

Maintenance Operations ("SMO") for the Processing and Distribution Facility in Eugene, Oregon ("Eugene plant"). (Soto Decl. ¶ 3.) Soto was one of three SMOs who all worked the day shift from 7:00 am to 4:00 pm. (Soto Decl. ¶ 5.) After one of the SMOs retired in May 2010, Eugene Plant managers and supervisors held a telephone conference regarding the vacant position. (Soto Decl. ¶ 6-7.) Conference call participants included Soto, David Long (USPS Maintenance Manager Lead), Robert Vore (Eugene Plant Manager), Barry Brenner, (Eugene Plant Maintenance Manager), and Bob Hohenberger (another SMO). (Soto Decl. ¶ 7.) According to Soto, Long said "I hope you are sitting down because your new maintenance supervisor is Shelley Brown." Vore said "Don't I have a say in this?" Long replied, "No, it has already been decided." After the telephone conference, Soto reports that Vore turned to Brenner and said, "We will change her shift then and see how she likes that." *Id*.

Shelley Brown, an African American woman, began working at the Eugene Plant in October 2010. (Brown Decl. ¶¶ 2, 6.) Although initially she worked the day shift, on November 4th she learned that she would work a modified swing shift from 12:00 p.m. to 9:00 p.m. effective November 22, 2010. (Brown Decl. ¶¶ 7-8, 14) Because of the shift change, Brown's job duties changed. (Brown Decl. ¶ 9.) Brown filed an Equal Employment Opportunity ("EEO") complaint in March 2011 as a result of this change in hours and job duties. (Brown Decl. ¶ 10.)

In May 2011, Robert Atkinson began a six month detail as Acting Manager of Maintenance, replacing Brenner, who retired on June 2, 2011. (Atkinson Decl. ¶ 2; Soto Decl. ¶ 12.) Atkinson became Soto's supervisor. (Atkinson Decl. ¶ 2.) Around this time, Soto learned an EEO investigator wanted him to file an affidavit in connection with Brown's EEO complaint.

2 – OPINION AND ORDER

(Soto Decl. ¶ 11.) Soto recalls that he told Vore, in the presence of Brenner, that he was going to file an affidavit that "would not be favorable to the agency or to him [Vore]." [1] *Id.*

Soon thereafter, Soto recounts that Atkinson approached him and asked him, "How do you think we should go about changing supervisor's hours?" (Soto Decl. ¶ 13.) Soto replied "I don't want to be a part of this and I want nothing to do with her [Brown's] hours being changed. I know why you are doing this and this isn't right." *Id.* After this encounter, Soto says he asked Vore, "Are you changing the supervisor's hours?" *Id.* Vore responded, "No, I am merely looking into the future if a position becomes open or vacant." *Id.*

On June 8, 2011, Atkinson met with the SMOs to solicit discussion regarding SMO staffing structure. (Atkinson Decl. ¶ 3-4.) On June 27, 2011, Atkinson provided Soto and Brown with notices that their shift ("tour") assignments were going to change effective July 9, 2011. (Atkinson Decl. ¶ 5.) Soto's shift was changed to the swing shift ("Tour 3") from 3:30 p.m. to 12:30 a.m. and Brown's shift was changed to the graveyard shift ("Tour 1") from 12:00 a.m. to 9:00 a.m. (Atkinson Decl. ¶ 6; Soto Decl. ¶ 14-15.) Hohenberger, the only non-minority SMO, remained assigned to the day shift ("Tour 2"). (Soto Decl. Ex. 4, p. 5.) Vore and Long authorized the shift changes. (Brady Aff. Ex. 9, Atkinson Depo. P. 28 ln. 20-24.)

Soto filed an EEO complaint on November 7, 2011 alleging, among other things, race discrimination and retaliation. (Soto Decl. ¶ 17.) On May 9, 2012, the USPS issued a final agency decision, concluding Soto was not subjected to discrimination. (MSJ Ex. 3.) On August 3, 2012, Soto filed this complaint.

---

[1] Although Soto's affidavit in support of his EEO complaint states this conversation took place on June 9th, 2011, plaintiff argues it must have occurred earlier, because Brenner, who recalls being present for the conversation, retired on June 2nd, 2011. (Soto Decl. Ex. 4 p. 1; Brady Aff. Ex. 6 pp. 17-18.)

## STANDARDS

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

**1. Discrimination**

Racial discrimination claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). First, the employee must establish a *prima facie* claim of discrimination. *Id.* at 802; *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). An employee must establish that 1) he belongs to a protected class; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) similarly situated individuals outside of his protected class were treated more favorably. *Davis*, 520 F.3d at 1089. Next, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the alleged disparate treatment. *Id.* at 1091. Finally, the employee must offer evidence

that the employer's proffered legitimate, nondiscriminatory reason for the alleged disparate treatment is a pretext for discrimination. *Id.*

Defendant does not dispute that Soto establishes a *prima facie* claim of discrimination. Rather, defendant argues that Soto was assigned to the swing shift for legitimate, nondiscriminatory reasons. First, defendant argues that Atkinson made shift changes in an "effort to improve maintenance support at the Eugene plant and to align maintenance coverage with the needs of the Eugene plant and the USPS guidelines with respect to EAS (supervisory, non-bargaining) oversight of maintenance operations and staffing expectations." (Atkinson Decl. ¶ 8.) According to Atkinson, the changes facilitated operational benefits including:

    a.    Direct oversight to maintenance employees by maintenance supervisors;

    b.    Ability to correct current employee performance issues from the same tour;

    c.    Enhancement of inter-tour communication of equipment issues that affected mail processing during the night and coordination of effective maintenance response to minimize machine downtime and improve performance; and

    d.    Alignment of position start times with standard coverage expectations from USPS HQ, Western Area.

(Atkinson Decl. ¶ 7.) With regard to the decision to assign Soto to the swing shift, Atkinson tried to avoid changing the SMOs' administrative responsibilities and effect the least disruptive change possible. (MSJ Ex. 6, pp. 7-10.)

Defendant further argues that plaintiff fails to raise a genuine issue of fact as to whether these legitimate, nondiscriminatory reasons are a pretext for race discrimination. I disagree. Plaintiff has presented evidence that Eugene Plant management knew reassigning shifts would not improve maintenance support. Brenner, the prior maintenance manager, testified that the

5 – OPINION AND ORDER

Eugene Plant had unsuccessfully assigned SMOs to the swing or night shift in the past. (Brady Aff. Ex. 6, p. 10.) He testified that most of the SMOs job duties had to be performed during the day shift when equipment was not running. *Id.* Further, he testified that most of the employees the SMOs supervised worked the day shift, and that there were other managers who could supervise maintenance employees who worked the night shift. *Id.* Finally, he testified that there were so few maintenance employees on swing and night shifts that it was "a waste" to have a SMO supervising such few employees. *Id.* at 11.

In addition, Plaintiff presents evidence that his shift change rendered him unable to perform all of his job duties. Soto's supervisees worked on the day shift that only overlapped with his shift by one half hour. (Brady Aff., Ex. 7, p. 14.) Soto was no longer able to travel to other Eugene postal stations because they were only open during day shift hours. (Brady Aff., Ex. 6, pp. 12-13.) Soto was unable to meet with contractors who had contracted work with the Eugene Plant. *Id.* at 14. Further, Plaintiff argues that USPS guidelines recommended 24 hour supervisory coverage for years but management never implemented the recommendation at the Eugene plant until his shift change. (Atkinson Decl. Ex. 2.) Additionally, plaintiff alleges that when employees filled in for him as SMO, they worked the day shift. (Soto Decl. ¶ 16.) Finally, plaintiff alleges that since he and Brown left employment with the USPS, no other SMOs have worked either the swing shift or night shift. *Id.* at ¶ 19.

Plaintiff presents substantial evidence that creates a genuine issue of material fact as to whether defendant's proffered legitimate, nondiscriminatory reason for changing Soto's shift is a pretext for discrimination.

**2. Retaliation**

Claims for retaliation are subject to the same *McDonnell Douglas* burden-shifting analysis as discrimination claims. To establish a *prima facie* claim for retaliation, an employee must establish 1) his involvement in protected activity, 2) an adverse employment action, and 3) a causal link between the two. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2001). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 970. Finally, the employee must offer evidence that the employer's proffered legitimate, nondiscriminatory reason for the alleged adverse employment action is a pretext for retaliation. *Id.*

An adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000). In establishing a causal link between the protected activity and adverse employment action, an employee must prove the employer's "desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Southwestern Medical Center v. Nassar*, --- U.S. ---;133 S.Ct. 2517, 2528 (2013). Causation may be inferred from timing when "an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.* 281 F.3d 1054, 1065 (9th Cir. 2002).

Defendant concedes that plaintiff is able to meet its burden on the first prong of the *prima facie* claim for retaliation. Defendant argues that plaintiff is unable to establish he suffered an adverse employment action, and that retaliatory desire was the but-for cause of the adverse employment action. I disagree.

Defendant argues Soto's shift change was not an adverse employment action because Soto was not deterred from filing an EEO complaint. While Soto's EEO complaint may shed light on the issue of whether management's actions are reasonably likely to deter Soto or others from engaging in protected activity, the analysis does not end there. The proper inquiry is whether the employer's actions are likely to deter a reasonable person from engaging in protected activity. Soto's shift change impaired his ability to do his job. His supervisees worked the day shift, he was unable to visit other Eugene facilities because they were only open during day shift hours, and he could not meet with contractors. Working a swing shift also potentially deprived Soto from spending considerable time with his family during the work week. Viewing the facts in the light most favorable to the plaintiff, I conclude there is a genuine issue of fact concerning whether the defendant's actions would deter a reasonable person from engaging in protected activity.

Defendant also argues there is no question of fact regarding the issue of causation. Defendant argues management discussed the idea of 24 hour supervisory coverage for years prior to making shift changes. In addition, defendant argues that Atkinson did not know about Soto's protected activity on June 8, 2011 when he met with SMOs to discuss schedule changes because Soto didn't tell Vore about his participation in Brown's EEO investigation until June 9th. Plaintiff argues that Soto must have told Vore about his EEO participation more than a week earlier because Brenner was present, and Brenner retired on June 2nd. Regardless of when Atkinson learned of Soto's protected activity, Soto's June 27, 2011 notice of shift change was authorized by both Vore and Long, and Vore had knowledge of Soto's protected activity sometime in the beginning of June.

8 – OPINION AND ORDER

Finally, defendant argues that even if plaintiff has met his *prima facie* burden, defendant has produced a legitimate, non-discriminatory reason for changing Soto's shift. For the reasons discussed in the previous section, plaintiff has produced evidence that creates a material issue of fact as to whether that reason is a pretext for retaliation.

## 3. Hostile Work Environment

A plaintiff in a hostile work environment claim based on race must show 1) that he was subjected to verbal or physical conduct of a racial nature; 2) that the conduct was unwelcome; and 3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment[2]. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). To determine whether conduct was sufficiently severe or pervasive, we consider the totality of the circumstances, "including the frequency of the discriminatory conduct; the severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[ed] with an employee's work performance." *Id*.

Soto argues that his shift change was motivated by discrimination and retaliation, and that by coming to work every day and experiencing the effects of this discrimination and retaliation he was subjected to a hostile work environment. These facts simply do not support a hostile work environment claim. Even assuming that changing a person's shift is "verbal or physical conduct of a racial nature", plaintiff fails to establish that the conduct was sufficiently severe or pervasive to alter the terms and conditions of the plaintiff's employment.

---

[2] Defendant argues plaintiff failed to exhaust his administrative remedies regarding his claim for a hostile work environment. Because I find the hostile work environment claim fails as a matter of law, I do not address the exhaustion issue here.

9 – OPINION AND ORDER

A review of other hostile work environment cases reveals that plaintiff's shift change is not severe or pervasive conduct. In *Vasquez*, plaintiff's hostile work environment claim was based on his supervisor's comments that plaintiff had "a typical Hispanic macho attitude" and that he should transfer to field work because "Hispanics do good in the field." *Vasquez*, 349 F.3d at 643. Plaintiff's claim was also based on two instances when his supervisor yelled at him in front of the youth he supervised, and allegations that his supervisor made false complaints about him to upper management. *Id.* The court held that these incidents did not rise to the level of severe and pervasive conduct. *Id.* In *Sanchez v. City of Santa Ana*, plaintiff alleged that his employer posted a racially offensive cartoon, made offensive racial slurs, selectively enforced rules against Latinos, ostracized Latinos, provided Latinos with unsafe vehicles, and failed to provide Latinos with adequate backup on police calls. 936 F.2d 1027, 1031 (9th Cir. 1990). The court held this conduct was not adequately severe and pervasive to support a claim for a hostile work environment. *Id.* at 1037. In *Manatt v. Bank of America, NA*, plaintiff, an American citizen of Chinese decent, was subjected to frequent derogatory comments about Chinese people, had her pronunciation mocked by coworkers, and witnessed coworkers holding their eyelids in a slanted position while mocking Chinese people. 339 F.3d 792, 795 (9th Cir. 2003). The court held that this conduct was not severe or pervasive enough to support a hostile work environment claim. *Id.* at 798-799.

These cases allege far more serious and frequent offensive conduct than Soto does and Soto's hostile work environment must fail. To hold otherwise would mean every act of discrimination or retaliation also creates a hostile work environment.

## CONCLUSION

Defendants' motion for summary judgment (ECF No. 15) is DENIED in part and GRANTED in part.

IT IS SO ORDERED.

DATED this 9th day of April, 2014.


_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge

11 – OPINION AND ORDER